# WHEELING.

## SMITH v. MITCHELL.

Submitted June 15, 1911.     Decided June 16, 1911.

1. STATUTES—*Enactment—Reading of Bill.*
   A bill is introduced in the House of Delegates as House Bill No. 161, and the bill is introduced in the Senate as Senate Bill No. 99. The House bill is read duly and passed by the House and reported to the Senate. The Senate bill is read twice on different days and on second reading the Senate substitutes for it the House bill under the name of House Bill No. 161, and under that name it is read on another day and passed by the Senate. The bills are identical in title and matter. The bill passed by the Senate has been read in it three times as required by the Constitution. (pp. 482 to 486).

2. SAME—*Enactment—Power to Reconsider.*
   After a bill has been passed by the House of Delegates and reported to the Senate, and it has passed the Senate and been by its order sent to the House with report of its passage by the Senate, and the House refuses to return it to the Senate, the Senate cannot reconsider the vote passing the bill, as it has no possession or control over the bill, and its vote to reconsider will not impair the validity of the act. (pp. 486 to 491).

Petition by Homer Smith and others for *mandamus* to R. E. Mitchell, Clerk of the County Court of Mason County.

*Writ Denied.*

*Brown, Jackson & Knight, Mollohan, McClintic &· Mathews, John L. Whitten* and *Sommerville & Sommervile,* for petitioners.

*W. M. O. Dawson, T. C. Townsend* and *Rankin Wiley,* for respondent.

BRANNON, JUDGE.

Until the enactment of chapter 85 of the Acts of the Legislature of 1911, the council of the town of Point Pleasant had sole and exclusive power to grant license to sell spirituous liquors, without regard to the county court of Mason county; but that act took away this council power by the provision that, "No license to sell at wholesale or retail spirituous liquors, wine, porter, ale, beer or drinks of like nature shall be granted

by the council of said town. Such license shall only be granted
by the county court in the manner prescribed by law." Upon
the claim that this act is void, Homer Smith obtained from the
town council a permit to obtain such a license, and armed with
this council order he applied to R. E. Mitchell, clerk of the
county court, for a certificate of such license; but Mitchell
refused to recognize the order of the council, and refused to
issue the certificate requested. Thereupon, Smith applied to
the Supreme Court for a writ of *mandamus* to compel Mitchell
to issue to him the certificate to obtain such license.

In the argument before this Court of this much contested
case two grounds were urged for the contention that the Act
of 1911 is null and void, leaving still in force the former statute
giving the council sole power to grant such license. One ground
is, that the bill was not read in the Senate on three different
days, as the Constitution requires; and the second ground is,
that the bill never finally passed the Senate so as to become a
law.

As to the claim that the bill was not read in the Senate on
three different days, the facts are, that a bill called Senate Bill
No. 99 was introduced into the Senate, and an exactly similar
bill called House Bill No. 161 was introduced into the House
of Delegates. That House Bill 161 was regularly read and
passed by the House, and reported to the Senate as passed by
the House, is not questioned. Senate Bill 99 was read twice
in the Senate. On its second reading the Senate substituted
the house bill for the senate bill, and under the name of House
Bill No. 161 it was ordered to be read a third time, and on
February 18th was read a third time and passed with its title.
As stated the titles of the two bills were the same, the bodies
the same, literally. For the purpose of the requirements that
a bill shall be read three times, we may say that these bills are
one, because they have the same title and the same enacting
language. The purpose of this provision of the Constitution is
to inform legislators and the people of legislation proposed by
a bill, and to prevent hasty legislation. The two readings of
the Senate Bill and the third reading of the substituted House
Bill did this, just as effectually as if the house bill had not
been substituted for the senate bill, and the senate bill had
been retained and read a third time and passed. Shall we give

this provision so rigid a construction as to go beyond its purpose and defeat legislation? There is nothing so special in a constitutional provision as to justify this.

Will it be suggested that this was another bill, a substitute, not Senate Bill 99, and that this substitute should have been read three times? I would answer that we can hardly call it a substitute because it is identical in matter with Senate Bill 99. But suppose even that the bills were not so identical; still the substitute bill, if so germane to the original bill as to be a proper substitute, would not have to go back and be read three times. A substitute is an amendment. "When a bill has been read and referred to a committee who have reported a substitute, having the same general principles, it is not necessary to the valid enactment of the substitute that it should be considered an original bill and read three times on the three different days." 26 Am. & Eng. Ency. L. 540. When a bill is amended it does not call for re-reading. *People* v. *Thompson,* 7 Pac. 142; 36 Cyc. 952; *State* v. *Dillon,* 42 Fla. 96; *Cleveland* v. *Anderson,* 66 Neb. 261. *Capito* v. *Topping,* 65 W. Va. 588, written by Judge POFFENBARGER, is pointed authority for this. A bill having same title as act No. 40 of 1894 was introduced in the Senate as S. B. No. 23, read by its title, placed on the calendar for second reading, subsequently taken up upon second reading, read by title, and referred to a committee.

The committee reported its action on Senate Bill No. 23, giving the exact title of the same. The committee reported the bill favorably by substitute. The bill was read by its title. Substitute adopted in lieu of original bill, and became S. B. No. 90. Bill as reported read by title. Subsequently S. B. No. 90 reported by the committee was put on its third reading, and read in full, then passed. *Held,* that the contention that S. B. No. 90 should have been considered an original bill, and read in the senate three times on different days, once in full, was not well founded. *Board* v. *Fowler,* 50 La. Ann. 1358. Take the case of *Miller and Gibson* v. *State,* 3 Ohio St. 475. "A bill after being read twice in the senate was committed to a select committee, who reported it back with an amendment, to wit: 'Strike out all after the enacting clause and insert a new bill.' The bill as amended passed the senate and house and became a law. The claim was made that the 'new bill'

had but two readings in the senate." The court said: "When it appears by the journals that a bill was amended by striking out all after the enacting clause, and inserting a 'new bill', so called, it cannot be presumed that the matter inserted was upon a different subject from that stricken out, especially when the matter inserted is consistent with the title borne by the bill before amendment." The court relied upon a presumption that the substituted bill was the same as the original, and being so, no three readings were required of the amended bill. In the present case the sameness of the senate and house bills is apparent. The court further said in *Miller and Gibson* v. *State, supra;* "But for argument's sake, let it be admitted that the bill as amended was read but once in the Senate; is the act for that reason void? That, counting two readings before the amendment, and the final reading, the bill was read three times, is conceded, for these readings are shown by the journal, and it is also conceded that, in general, three readings of an amendment are not necessary. But in as much as the amendment in this case is styled in the journal a "New Bill', it is said that three readings were necessary. Why necessary? The amendment was none the less an amendment because of the name given it. It is not unusual in parliamentary proceedings to amend a bill by striking out all after the enacting clause, and inserting a 'New Bill'. When the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different dates; but when there is no such vital alteration three readings are not required." That case is strong to show that such *sameness* dispenses with reading over again; strong to show that two readings of the senate bill and one of the bill after substitution of the house bill make up three readings. *Nelson* v. *Haywood*, 91 Tenn. 596, is of same effect. "A bill having been passed regularly by both houses was referred upon a difference between the two houses as to certain proposed amendments, to a joint committee of conference. The committee reported as follows: 'Your committee of conference, to whom was referred S. B. No. 10, with house amendments, beg leave to report the accompanying bill in lieu of said bill and amendment, in which is embraced substantially all the provisions of both houses. Your committee deem it prudent to propose a bill in lieu as

the original bill has been much disfigured by amendment, inter-lineations and erasures. Your committee asks that the bill offered be accepted and passed.' This re-drafted bill of the committee of conference contained fewer sections and annulled some of the proposed amendments, the committee substituting compromise provisions therefor. The committee's report was concurred in by both the houses and the bill signed. The bill was not passed after its re-drafting by the committee".

"*Held:* The act was constitutionally passed and is a valid law. The committee did not report a new bill. They had authority to make such changes as would reconcile differences between the two houses. It was not necessary that this bill be passed upon three readings after the committee reported."

I believe it is not, and cannot be, claimed that the bill after passage by the Senate had to go back for concurrence of the House in the substitute, for the reason that the substituted house bill was not variant from, but identical in title and en-acting matter with House Bill 161. "An immaterial amend-ment need not in any 'way affect the substance. Where a ref-erence to 'Thompson & Steger's Code' was struck out, and the 'Revised Code of Tennessee' inserted in its place, both being the same book, it was held that there was not any substance and amendment requiring concurrence." Note 30, 36 Cyc. 956, citing *Gaines* v. *Harrigan*, 4 Lea (Tenn.) 608. In our case there was no difference between the two bills save in name and number. Name and number are no part of the real bill, merely designating for convenience, and cease on passage, and do not appear in the published act. Judge POFFENBARGER lays down the rule that no bill can become a law in less than five days. 36 Cyc. 950, says: "A substantial compliance with a constitu-tional requirement as to the reading of bills is sufficient * * * The requirement that bills be read on different days in each house will not prevent the reading of a bill in one house on the day that it was passed by the other." A note there found says that "When duplicate bills are introduced in both houses the substitution and final passage of the house bill for the senate bill on its order of third reading does not render the substitute bill obnoxious to the constitutional requisite that bills shall be passed on three different days in the Senate", citing *Archibald* v. *Clark*, 112 Tenn. 522, 82 S. W. 310. It is

conceded that it may be read in one house the same day of its passage by the other. So held in Arkansas. 26 Am. & Eng. Ency. Law, 540, citing *Chicot* v. *Davis,* 40 Ark. 200. Does the requirement of three readings on different days in each house necessarily mean three days in one house, and three other days in the other house? May it not intend only that each house must have three daily readings, but the readings may be on the same days in each house, in case of a duplicate bill? When both houses have enacted the same words literally, why may we not say· that both branches have agreed to the same words? The object is to let the members have notice of the measure by three daily readings. This is accomplished by three readings in each house, though on same days. The houses are distinct for this purpose. All that is required is the assent by the two bodies to the same thing. It has been constant practice in our Legislature to so proceed with duplicate bills. But we do not have to so say in this case.

Judge POFFENBARGER seems to say that our decision would allow a house bill to be read three days in the House, then go to the Senate, and there a substitute be adopted, and it then passed without three daily readings. By no means do we say so. In our case the duplicate bill was read three times in each house. The very same bill was so read. The bill for this purpose is not the mere piece of paper, but it is its contents that must be read. The contents are what is meant by the word "bill" in this provision of the Constitution. The duplicate was, under facts above stated, read three times on different days in each house. That is the case which we decide. Thus we come to the conclusion that the three readings required by the Constitution were had.

Next, as to the second ground given for the invalidity of the act, that is, the claim that the bill never became a law for want of final passage by the Senate. As stated above the Senate passed the bill February 18, and ordered its passage by the Senate to be reported to the House, and it was so reported. On February 20 the Senate adopted a motion to reconsider the votes by which it had ordered House Bill 161 to be read a third time and passed. The Senate passed an order requesting the House to return the bill to the Senate; but the House in response to this request, on February 21, refused to return the

bill to the Senate, giving as its reasons that the bill had become a law, and passed beyond its jurisdiction. In response the Senate adopted a resolution insisting that its vote of reconsideration had the effect to undo its vote passing the bill, and insisting that the bill had not become a law, and insisting that it be returned to the Senate. The House did not order it returned to the Senate. On February 24 the Senate appointed a committee to call on the Governor and Secretary of State and request the return of House Bill 161 to the Senate, and to call on the House of Delegates and its Speaker and request such return. The committee reported that the Governor informed it that the bill had been delivered to him at 4:30 o'clock P. M. on February 20, and that he had approved the bill and delivered it to the Secretary of State at 5:10 o'clock P. M. and having so disposed of the bill he had no further control over it. The committee further reported that it had demanded the bill of the Secretary of State, who replied in writing that he had surrendered it to the Keeper of the Rolls, and had no further custody or control of it. The committee further reported to the Senate that it had waited upon the Keeper of the Rolls, M. M. Neely, clerk of the House (who is *ex officio* Keeper of the Rolls) and informed him of the Senate's request for return to it of the bill, and he produced the bill, stating that he had that moment received it from the Secretary of State, and stated that he would ask leave of the Speaker to return it to the Senate. The question whether it should be returned was again submitted to the House and the House referred it to the Judiciary Committee, and it reported that it could not advise the House whether the bill had become a law, and that whether a law or not, its validity could not be affected by retention of the engrossed bill. The House laid the report on the table. The House never ordered the bill returned. On February 20 the Speaker of the House wrote the Governor that the Senate had requested him to return engrossed House Bill No. 161 to the Senate, the Senate having reconsidered its action in passing it. The Governor on same date replied that the bill had been received by him at 4:30 P. M. on that date (20th February) and approved by him at 5:10 P. M. and delivered to the Secretary of State. So, the bill never returned to the Senate. After the Senate passed it, 18th

February, it was on that date, by order of the Senate, reported to the House as passed by the Senate, and went to the joint committee of the two houses on Enrolled Bills, charged with duty to compare bills passed with their enrollment, correct errors, and present to the Speakers of the House and President of Senate, and then present them to the Governor for his actions. It seems that the bill was in the hands of this committee on the 18th after its passage by the Senate was reported to the House. Thus, it seems that this bill was passed by the Senate on February 18, reported same back to the House, went to joint committee same date for performance of its functions, was reconsidered by the Senate at 4 o'clock P. M. 20th February, presented to the Governor at 4:30 P. M. same day, approved and delivered to the Secretary of State at 5:10 P. M. same day, and on February 24 went to the Keeper of the Rolls. The question is, what is the effect of the action of the Senate reconsidering its passing House Bill No. 161? For Smith it is with confidence pressed upon us that such vote nullified the vote of the Senate passing the bill, and thus the bill wants passage by the Senate, and the bill never became an act, so as to be law. We do not question that a bill must be passed by both houses of the Legislature; but we say that this bill *was* so passed. This is so unless the vote of the Senate to reconsider did away with the Senate's passage of the bill. To sustain the view that such vote to reconsider works that result, we are cited to a provision of the Constitution, Art 6, section 24, that "each house shall determine the rules of its proceedings," and that under it there is a Senate rule saying that "it shall be in order for any member voting with the prevailing side to move a reconsideration of the same within two succeeding business days." That such motion may be made inside two days, under any circumstances. This rule has for its purpose a limitation of time upon reconsideration. It must be applied in practice conformably to general principles of parliamentary law governing reconsideration. A fundamental principle of that law is, that to enable a legislative body to reconsider a vote passing a bill it must have control and possession of it. If it has performed its office upon the bill, and it has gone from its physical possession and control, it cannot reconsider. It has lost jurisdiction. The case is no longer in court. Neither

a legislative body nor a court can act upon a matter not before it. This is fundamental. When the reconsideration in question in this case was voted, the bill had passed the House and Senate, had been sent back out of the Senate by its order to the house, and was in the files of the House, which refused to return it to the Senate, or in the hands of the committee on enrolled bills, without power of return. The Senate had completed its function and ousted itself of jurisdiction. What is the authority as to this? "This right to consider remains *so long as the bill remains in the custody of the body proposing to reconsider* unless they have some special rule restraining the right to reconsider. The matter is still *in fieri* while pending before and within control of either house. And it is not an infrequent occurence for one house, which has finally passed a bill and sent it to the other house, to request its return, *which being done*, the vote on its final passage is reconsidered. There must be a time when the right to reconsider terminates—and the same rule applies in the one case as in the other and that is, when the bill or law has passed from the custody or control of the department or body seeking to reconsider." *People* v. *Hatch,* 19 Ill. 283. In *Wolf* v. *McCaull*, 76 Va. 876, a joint resolution recalled a bill then before the Governor, but not acted on by him. The court held this recall void, the return of the bill by the Governor void because without authority, and the act had by operation of law become a law without approval.

I have cited this case as authority for the proposition that to render reconsideration effective the bill must be yet in the possession of the body, the court saying: "When does the power of control over a bill passed by both houses close and determine? There must be a time in parliamentary proceedings when the controlling power of the legislative body must come to an end. If the general assembly had the power to recall the bill it must have been for the purpose of reconsideration because no motion to reconsider it is in order unless the paper is before the body in which the motion to reconsider is made. (Jefferson's Manual, 93)". In *Allegheny County* v. *Warfield*, 100 Md. 516, 108 Am. St. R. 446, conceding power of Governor to erase his approval, yet it is made dependent on the fact that the bill is yet in his custody. Jefferson's Manual of Parliamentary Law says, "After a bill, resolution, message, report, amendment or

motion upon which a vote was taken shall have gone out of the possession of the Senate" no motion to reconsider can be made. Section 42. I cite *People* v. *McCullough*, 210 Ill. 488, 71 N. E. 262, and *State* v. *Whisner*, 35 Kansas 271, 10 Pac. 852, for the proposition, that after the Governor has delivered the bill to the Secretary of State he has lost power of recall. Why? The cases say he has no physical possession or control of the document. This is the test in such cases; so it is in our case. The cases are in principle subject to the same test.

For the proposition that to justify reconsideration by a legislative body it must still have possession of the bill, a brief cites Croker's Procedure 80, 182; *Hunneman* v. *Grafton*, 10 Metc. (Mass.) 454; *Reed* v. *Actton*, 117 Mass. 348; *Bigelow* v. *Hillman*, 37 Me. 52; *Estey* v. *Star*, 56 Vt. 690; *Marsh* v. *Scitnate*, 153 Mass. 34; *Brown* v. *Winterport*, 79 Me. 305.

Great force is attributed in behalf of Smith to the case of *State* v. *Bank*, 79 Conn. 141, 64 Atl. 5. The case is widely different from our case, in that respect on which our decision as to this point rests, namely, the continued possession and control of the bill. A bill passed both houses, but a motion to reconsider was made, pending and not disposed of, and by mistake, without authority it was delivered by the clerk to the Secretary of State. The court as its reason said in words that "While the bill was in the possession of the house and on the desk of the Speaker, the house had entertained a motion to reconsider." In our case the bill had left the Senate by its order, the Senate thus declaring that it had finished consideration of it.

Very clear it is that when a bill has passed both branches of the Legislature, and been approved by the Governor and filed with the Secretary of State, the bill cannot be later reconsidered or recalled by either or both branches, simply because the Constitution says that when so approved it is law. And further after a bill has passed both branches and gone to the Governor for his action it can not be reconsidered or recalled by the Legislature, for the reason that it has ended its function and lost control and possession, the legislative department has acted on it, and it has gone to another department of the government, the executive, for its action, *Wolfe* v. *McCaull*, 76 Va. 876; 26 Am. & Eng. Ency. L. 548. The New York

case of *People* v. *Devlin,* 88 Am. Dec. 377, while the syllabus gives power to recall by the joint action of both branches, the opinion wholly denies the power.    Under the last mentioned principles the reconsideration being abortive, the bill became an act, and no right to recall it by the Senate existed, and the bill became law.

Precedents or instances there are of the federal Senate and House where one body has, on request by another, returned bills or resolutions, just as there have been instances where governors have returned bills presented to them, and the power silently conceded, as stated in 26 Am. & Eng. Ency. L. 548; but such concession would not make law.    We have not before us what such bodies may do.    We have the dry question of law whether after the Senate had done with the bill, its vote to reconsider will nullify the passage of the bill, the House not consenting and refusing to return the bill, the Senate never repossessing itself of the bill.    We thus do not have the question whether the Senate could have affected the bill, had the House returned it.    It had passed both houses.    Could one alone nullify its past act of passage demanded by the Constitution, which passed act had taken legal effect by force of the Constitution?    The well considered case of *People* v. *Devlin,* 88 Am. Dec. 377, and others cited in 26 Am. & Eng. Ency. L. 148, say one branch cannot recall from the governor.    Why can one branch, against the will of the other, recall from that other? if it does, it has no effect.    We are not dealing with the question of courtesy between the houses or what the House should have done.    We know what it did do.    It refused return of the bill.

As to "recall" from the Governor.    The House never joined in it, nor authorized the Speaker to do so.    Where is the Speaker's authority to do so?    The Senate alone made a recall on 24th February.    The bill had then been enrolled, signed by the Speaker and President of the Senate, approved by the Governor, filed with the Secretary of State.    After all this, after all these proceedings, this Court is asked to ignore it all, and overthrow the act.    We think this Court would be going far, straining its legitimate powers, to do so.

Holding the act valid we refuse the *mandamus.*

Above I have given the reasons moving the Court in its de-

cision of this case. Some time after writing those reasons I became impressed, speaking for myself, with what was somewhat suggested in oral argument, and with a line of thought furnishing an additional argument or reason supporting that decision. An attorney for Mitchell made the point that the vote of the Senate passing the bill was never actually recalled. He said that when the reconsideration was voted, the next question before the Senate was, "Shall the bill pass"; but that question was never put, that vote never taken, and thus the original vote passing the bill stood. If so, that settles that the act is valid. At any rate be that as it may, we have the fact that the Senate did once vote the passage of the bill; the fact that it did not by actual vote reject the bill after its vote to reconsider; the fact that the bill had before been reported back to the House as passed; the fact that it went to the joint committee and was enrolled and signed by the President of the Senate and Speaker of the House; the fact that it went to the Governor, and was by him approved, and after the executive had finished its part in the enactment, was finally filed in the office of the Secretary of State; the fact that it went to the Keeper of the Rolls, the Clerk of the House; and now after passing through this curriculum or course of enactment the Court is asked, in a collateral proceeding, to overthrow the act. Without asserting that the failure to vote a rejection of the bill left the original vote of passage still good, we do say that a court after such procedure cannot hold the act null and void. And further if this is doubtful, then the rule that before a court can hold an act invalid the question must be clear, is alone enough to deny the *mandamus*.

If there had been no vote of the Senate passing the bill the case would be different. While some cases say that a court cannot inquire whether a bill was passed by both legislative houses when approved by the Governor, the preponderance of law is that the judiciary may look to the journals to see whether the constitution has been in this respect complied with; but that is not our case; for the journal of the Senate shows compliance with this requirement, everything regular, the only question being as to the effect of the vote to reconsider. We are asked to enter into details of procedure in the Legislature, to inquire into regularity or irregularity, and pronounce that the vote

to reconsider, without further reconsideration, nullifies the Senate's former action, passing the bill; to pronounce that the action of the law making powers, legislative and executive, is irregular not only, but goes to the extent of nullifying the act. A court cannot usurp this function. It is a well known principle that if a court has jurisdiction mere irregularity or error in the course of procedure does not make its action wholly *void*. Shall we say that this irregularity avoids this act; that the Legislature having sole jurisdiction has erred, and thus rendered the act void? If a court cannot do this in judicial actions, much less can it review the various steps of a legislature.

After a full discussion of a petition for rehearing this Court refused it. I make this note to add some authority which I have met with today. As to the position taken in the above opinion that the Senate having returned the bill to the House as passed it had lost possession of the bill and could not reconsider. Cushing on the Law and Practice of Legislative Assemblies, section 1274, says that "though a motion for reconsideration may be made and discussed in the absence of a paper to which it relates; yet if decided in the affirmative, it will be wholly ineffectual and inoperative until the paper is in possession of the house. The first step, therefore after vote to reconsider is to send to the other branch for the paper in reference to which the vote to reconsider passes, or otherwise to bring it before the house." For myself I do not see why the paper is not necessary on the motion to reconsider. Why? Because the members want to see it, so as to vote intelligently on that motion. Why necessary to have the bill present when reconsideration takes place? In order that the members may read it before voting. Precedents in Congress show that such was the understanding. The House requested the Senate to return a bill, "There being a motion pending to reconsider the vote by which the House passed the same." The senate complied with the request. In the senate the question was whether a motion to reconsider was in order in as much as the resolution announcing the decision of the senate on the nomination of Isaac Hill had been communicated to the president, and it was unanimously determined that the motion was not in order. The Senate recalled a bill from the House before reconsidering it. Decisions on points of order in the U. S. Senate by Gilfrey 161, 411, 493.

· · The Senator. I move that the House of Representatives be requested to return to the Senate—(stating the number and title of the bill). In Senate Mr. Ingalls rose to a question of order and stated that a bill which passed the Senate on Thursday last had not been sent to the House, but had been retained by the Secretary for two days, at the request of a senator who desired to enter a motion to reconsider the vote on its passage; and asked the ruling of the chair upon the question whether under the rule it was competent for the Secretary to retain a bill, after its passage by the Senate, at the request of a Senator for the purpose of a motion for reconsideration within the two days allowed for that purpose. The President stated that such had been the uniform usage of the Senate, inasmuch as the rule gives the right within two days after passage; but it submits to the Senate whether the practice hereafter shall be in conformity with usage or strictly conform with the rule. The Senate assented. Senator Ingalls was an able parliamentarian. He understood that it was necessary to have the bill in the possession of the Senate for reconsideration, and the whole Senate assented. Thus we have the ruling of that distinguished body. Why keep the bill in the hands of the Senate, if it was not necessary to act on a motion to reconsider? Same book, page 414. The same book, page 161, says: "There are many reasons that make it necessary for one House to request of the other the return of the bill. The following are sample cases", giving reconsideration as an instance. The Senate may have said in the Hill case that it could vote to reconsider in the absence of the bill; but did not say that it could finally act on it. In the original argument an attorney contended that the vote of the Senate was only one to reconsider; that the next question in order was, "Shall the bill pass?"; that as no such question was put and no vote token upon it, the original vote of passage was not disturbed. It would seem upon some authorities that when a vote to reconsider is carried it is a withdrawal of the vote of passage, leaving the bill stand as if the body had never voted for its passage. It is not necessary to say how this is; but I find the case of *Ashton* v. *City of Rochester*, 60 Hun. 372, holding that without such a vote on the question of the passage of the bill, the original passage stands. The opinion also holds that a "motion to reconsider" may be entertained if

the house has control of the bill, thus sustaining the proposition that it cannot do so in the absence of the bill.

*Writ denied.*

POFFENBERGER, JUDGE, *(dissenting):*

Deeming this decision and the opinion upon which it stands palpably unsound, and wholly unsustained by any real authority, I dissent, and would grant peremptory writs of *mandamus* in all of the nine cases, commanding the clerk of the county court to issue the certificates of license.

The question for this Court is not one of license or no license. It is merely one of constitutional law, and nothing here involved calls for deviation from the plain letter of the constitution or the settled construction thereof. The doctrine of the opinion has never been adopted by the legislature of this state or any other, so far as I am able to see. On the question of reconsideration the two houses utterly disagreed, the senate demanding the right always previously exercised by each house, with the acquiescence of the other, and the house denying it. That the action of the senate, in the case of the bill here involved, was in accordance with settled practice is not denied by anybody. It cannot be. That practice makes legislative law, which this Court has no right to ignore, nor to allow one of the two bodies to abolish without the concurrence of the other. Moreover, that practice and law seem to be uniform in all American legislative bodies, including the Congress of the United States. Those who will take the time to read this necessarily long opinion will find that nothing stands to the contrary of this conclusion, not even dicta, much less decision or reputable text.

I make no apology for the length of this opinion. Proper settlement, in few words, of questions of the number, magnitude and intricacy of those involved here, is impossible, and an attempt to do so amounts to a dismissal without adequate consideration or effort.

In discussing the first question, whether the bill on which the case turns, published as an act of the legislature, had the three constitutional readings in the senate, we must not lose sight of the purpose of the clauses of the constitution, prescribing an exclusive mode of passing laws, nor the elements of that

method. The legislature consists of two separate and distinct, but co-ordinate houses, each having its own membership, its own organization, its own records and journal, its own officers, its own exclusive place of deliberation and action, in which its authority is practically unlimited, and its own complete and exclusive jurisdiction within its sphere. They necessarily act separately in passing bills and resolutions. The jurisdiction of one necessarily excludes the other. They therefore, cannot act upon the same thing at the same time. To become a law, a bill must pass both houses. Nobody can gainsay this. It cannot pass either house otherwise than in the constitutionally prescribed manner. It must be "fully and distinctly read, on three different days" or "in case of urgency", this rule must be dispensed with "by a vote of four-fifths of the members present, taken by yeas and nays", and entered upon the journal as to any bill passed in a different way, and the rule cannot be so dispensed with for more than one bill at a time. This is indisputable. The purpose of these provisions is best shown by their inevitable results. First, the journals of the two houses, not one, must show the passage of any given act or it is no act. It can stand on no other foundation. Full and complete journal entries of one house do not suffice. Passage by one is not enough. Neither the legislature nor the courts can give an act any other foundation or provide it any other substructure. The journals are made by the organic law, the sole and exclusive evidence of the existence of a statute, when the question of its enactment is carried to a final test. While some courts deny these journals the status of evidence, to be considered on such a question this Court has solemnly and repeatedly declared, not only that they are, but also that they are the best, controling, and conclusive. In other words, some courts say they cannot go back of the signatures of the presiding officers of the two houses and the enrollment and impeach an alleged or apparent statute by showing lack of passage by either house; but that is not law in this state. Here, failure of the journal of either house to show passage of the alleged act is fatal. Passage by each house must affirmatively appear on its own journal and not otherwise. "Just as good" plans or schemes are inhibited. Substitution of equivalents is positively forbidden. Shilly-shallying, surprise, ambuscade and uncertainty are completely, wisely

and justly fenced out. As these requirements are simple and apparently arbitrary, and the necessity or justification thereof is neither self-evident nor always perceptible by the masses of the people, occasional complaint of the restriction they impose is reasonably to be expected from interested and over zealous people, when their hopes, purposes and expectations fail by reason of non-compliance therewith.

The reason for the other clause of the constitution, prescribing the mode of passage through each house is likewise discernable in the result of its operation. The two houses are separate but co-ordinate bodies, as I have stated. The constitutional plan is to pass bills through these two houses successively. They do not act at the same time upon the same matter, and cannot in the nature of things. The jurisdiction of one excludes that of the other, for the time being, just as occupancy of space by one body excludes therefrom all others. The constitution, therefore, plainly requires successive passage of bills through them. A bill originating in the house must have its three days there and then its three days in the senate. This aggregate of six days for passage through the two houses may be cut to five by giving the house bill its first reading in the senate on the day of its final passage by the house; but five days necessarily constitute the minimum period. This period of time and this order of action by the two houses are contemplated and imperatively required, unless the constitutional rule is set aside by a vote of four-fifths of the members present in one or the other of the two houses, and, when it is so set aside, the fact must appear by a yea and nay vote entered upon the journal. One of two things must appear from the journals in the case of every statute. Five days must have been consumed in consideration thereof on the floors of the two houses, acting successively, or the requirement must have been dispensed with in a prescribed manner. Thus, in all ordinary cases, five days at least are required for the passage of a bill through both houses and as many more as result from omission to bring it up in either house for consideration by reason of neglect, choice or impossibility due to the pendency of other business. The obvious purpose of this is to compel devotion of a prescribed period of time and order of action to every bill that becomes a law, as a means of preventing hasty and inconsiderate action in the high and import-

ant function of making laws, affecting in every instance somebody's interests and in some way. Might a shorter period or a different course of action be as efficacious or sufficiently so? That is not a question for this or any other court, or the legislature or either house thereof. It was for the sole and exclusive determination of the people of this state in adopting the constitution, and we have their decision. To hold compliance with this provision unnecessary or to allow the legislature to ignore or evade it, 'when the inhibitive power of the courts is properly invoked, is worse than judicial legislation, a thing wholly indefensible and unjustifiable. It amounts to judicial amendment of the constitution itself, an assumption of power having no shadow or pretext of justification in law, reason or morals.

The method of the alleged passage of House Bill 161, if sustained, reduces the minimum period for passage of a bill by both houses from five to three days, without a suspension of the constitutional rule in the constitutional way by either house. It may originate in one, have its three readings there on separate days and, on the day of its passage there, be transmitted to the other, there substituted for a similar or like bill, on second reading, and passed. This amounts to a plain, palpable and radical violation of the constitutional plan. The public is thus denied two-fifths of the time allowed by the constitution for aiding or resisting the enactment of laws. As I have said, somebody's interests are always affected in some way by every piece of proposed legislation. Those who are so affected have a perfect right to resist it by lawful methods. The constitution guarantees to citizens the right of petition, and the clause thereof now under consideration was inserted to protect that right, as well as to prevent hasty action by either of the two houses of the legislature. The new method breaks up and confuses both proponents and opponents in and out of the legislature, dividing their time, attention and efforts and cutting off two-fifths of the period of delay reserved by the constitution for deliberation. To say this works no practical injury is not a logical or just answer to this obviously material abridgment or denial of a constitutional right, nor a reasonable exoneration from the charge of judicial amendment of the constitution. The people made the constitution and reserved to themselves the sole power of

amendment thereof.   To its provisions they made the legislative, the executive and the courts subordinate, withheld from all of them the power of amendment, and allowed to the courts only the right and power of interpretation by the application of legal rules and principles.   Though a man may be palpably guilty of deliberate murder by poison so that a jury could do him no possible good, the trial court could not deny him a jury for that reason.   A plaintiff in ejectment would be allowed to recover a mere worthless hole in the ground a thousand feet deep, or an utterly valueless rock pinnacle, though it were apparent the recovery could do him no sort of good.   Legal principles forbid such a reply.   Even though it be conceded that three days are as good as five for the constitutional purpose, the courts cannot alter the rule.   The senators opposed to the bill in question were entitled to two days more of time to make their efforts successful, and the constitution required both friends and foes of the measure to let that time elapse before passing it.   Had that been done, it might never have even ostensibly passed the senate—certainly would not have done so, for, on the second day after its alleged passage, the sentiment of that body had so far changed as to carry a motion to reconsider the vote of alleged passage, and to have formally rejected the bill, if the house had returned it as it should have done.   So the new method, if sustained, has passed a bill which could not have passed under the constitutional plan.

That House Bill No. 161 and Senate Bill No. 99 were identical in language and provision is a matter of no significance or import whatever.   They were nevertheless separate, distinct and strange bills.   One was a house bill and the other a senate bill.   Until the date of the transmission of the house bill to the senate, these two bills could by no possibility have been in the same house, notwithstanding the identity of their subject matter and terms   They were as purely distinct as two bills in equity, identical in subject matter and terms filed in courts of different states. Identity of bills does not, cannot result from identity of matter.   That is a legal impossibility.   The name and identity of a bill are determined by reference to the house in which it originates and in no otherway.   The house bill could not constitutionally pass the senate otherwise than as a house bill.   It was passed, if at all, under that name, number and descrip-

tion. The senate bill was laid aside, name, number and all. As a house bill, the constitution required three readings thereof on separate days in the senate. The two previous readings of the senate bill constituted no · compliance with this requirement. Those readings were not readings of the house bill. The house bill was not then in the senate and had not reached a legislative stage, authorizing it to be sent there. It was neither actually, legally nor potentially in the senate at that time. The utmost that can ·be said is that, while the house was deliberating on its bill No. 161, the senate partially considered another bill, having the same purpose. That was not action on the same bill. Obviously house bill No. 161 had only one constitutional reading in the senate, erroneously described as its third reading. Thus technicality, logic and constitutional purpose all agree that the new method is unsound.

The possible suggestion of lack of express terms in the constitution, inhibiting circumvention of its plain purpose, as opposing this view, is met by the stubborn fact that it fixes the period of deliberation, manifesting indubitable intent and purpose. What is within the intent of a statute or contract is a part of it and cannot be judicially eliminated. The same rule applies in the interpretation of constitutions. That which is clearly within the intent of the people in adopting a constitution can be neither legislated nor adjudicated out of it. Express terms are not necessary. "It is not always necessary, in order to render a statute invalid, that it should contravene some express provision of the constitution; if the act is inhibited by the general scope and purpose of the instrument it is as much invalid as though prohibited by the express letter of some of its provisions." 8 Cyc. 729. The soundness of this proposition is apparent, for the reason that the rule of liberal construction applies to constitutions. The rule of strict construction is applied only to penal statutes and contracts. When the purpose of a constitutional provision, not penal in character, is ascertained, it must be enforced, just as in the case of statutes and contracts. A legislature can no more defeat a constitutional purpose by shifts, devices and subterfuges than it can nullify plain words by such makeshifts. "The established rules of construction applicable to·statutes also apply to the construction of constitutions." 8 Cyc. 729. The majority

opinion narrows the purpose of this clause, saying it is only "to inform legislators and people of legislation proposed by a bill, and prevent hasty legislation." I say it does more than that. It gives legislators and people five days time for effort, for and against the proposed legislation. Why give information without time to make the information subserve some purpose? We are not asked to give the provision a construction "so rigid as to go beyond its purpose, and defeat legislation." I am unable to perceive the harmony of these two quotations from the same opinion. If this five day period was given to "prevent hasty legislation" the public and legislators are entitled to the whole thereof, not barely more than half of it. The provision contemplates more than mere notice. Each of the three readings required is for a purpose well defined in parliamentary law. If notice were the only purpose, that could be given more effectively in other ways, as by publication. The vital question here is whether there has been legislation, not whether legislation is to stand or fall.

An exhaustive search has disclosed but a single precedent for the position taken by my brethren on this branch of the case, and that is a poorly considered decision in *Archibald* v. *Clark*, 112 Tenn. 532. The opinion in that case, on a question of such importance, consists of a few printed lines, in which no reference whatever is made to the purpose of the constitutional clause, the wide scope of its operation or its wholesome effect as a safeguard against reckless legislation. The court contents itself with the simple observation that the legislative practice in that state justifies the construction it gives that clause. In so doing, it wholly ignores the legal principle inhibiting variation of plain terms in any instrument, even a simple contract, by conduct or contemporaneous or practical construction, and also the almost universally accepted doctrine that constitutional provisions are mandatory, and the obvious necessity of so regarding them, since to hold them merely directory is to authorize the legislature to ignore them at will. This precedent is not binding authority upon this Court nor in harmony with the principles applied here and throughout the country generally in the interpretation of constitutions. The constitutional clause in question is mandatory. *Price* v. *Moundsville*, 43 W. Va. 523; 26 A. & E. Enc. L. 539. "The great majority of all constitutional

provisions are mandatory, and it is only such provisions as, from the language used, in connection with the objects in view, may be said to be addressed to the discretion of some person or department, that courts have held to be directory; and these provisions in most cases have been those addressed to the legislative department with reference to the mode of procedure in the enactment of laws as above stated. But provisions of this kind will be treated as mandatory if the language used justifies it, even though the proceedings to which they refer are but formal." 8 Cyc. 762. By every legitimate test, the provision of our constitution, concerning the reading of bills, is mandatory. The effectuation of its obvious and high purpose demands the construction. It is mandatory in form, saying "No bill shall become a law until it has been fully and distinctly read, on three different days in each house", unless, &c. Then the requirement can be dispensed with in only one way. This is positive, direct and emphatic language, leaving no room for evasion in any form. The doctrine of this Court on this subject is expressed in *Capito* v. *Topping,* 65 W. Va. 587, as follows: "Being organic in character, constitutional provisions stand on a higher plane than statutes, and, as a rule, are mandatory, prescribing exact or exclusive times and methods of doing acts permitted or required." The following language of the opinion in that case applies well here: "It, (the provision there under consideration), is alternative and emphatic, saying if a certain thing is not done, another shall happen. Unlike many other provisions, it does not stop with the prescription of the affirmative act, leaving the consequence of failure to inference. It declares the sequence." That is the real meaning of the language of this clause. If a bill is read on three different days in each house and passed it becomes a law, but, if this be omitted, it cannot do so, unless such readings are dispensed with in the prescribed manner. I here apply this doctrine or principle of construction, not in refutation of any express declaration in the Tennessee case, or the majority opinion in this case, to the effect that the clause is directory, but rather to demonstrate that the decision cannot be justified or sustained upon that ground, as well as to show the high and sacred character of constitutional provisions and the spirit in which they are dealt with by courts.

As already stated, the lone Tennessee case professedly stands

upon the doctrine of practical, contemporaneous or legislative construction. That doctrine cannot be justly invoked here for two reasons. The uniform legislative construction in this state has been the other way. Substituted bills originating in the house other than the one making the substitution, have always been treated as separate or new bills in the substituting house and given their three readings on different days after substitution, until the session at which the bill in question here is alleged to have been passed. If the doctrine applies, this clause has been so construed as to make the action on this bill ineffective to pass it, for almost a half a century. In the second place, the language and purpose of the clause is clear, plain and free from ambiguity, wherefore the principle is wholly inapplicable. *May* v. *Topping,* 65 W. Va. 656, 664.

The majority opinion raises a vital question as to the character of the action of the senate in substituting the house bill without pausing to settle it by the application of any legal principle, namely, whether, by that action, the house bill became an amendment to the senate bill or a new or original bill in the senate. Identity of terms in the body of the two bills is suggested as a ground of incompatibility with the theory of substitution. The opinion says: "We can hardly call it a substitute because it is identical in matter with Senate Bill 99." Then an hypothesis is stated and an assumption made. Supposing it to be a substitute, the opinion says "A substitute is an amendment", and then follows the legal proposition that a bill need not go back for repeated readings after an amendment. If identity of matter precludes the legal view of substitution, it certainly precludes the legal theory of amendment. An amendment necessarily implies a change or alteration as to matter. Manifestly identity of matter is more inconsistent with the idea of amendment than that of substitution. Substitution does not necessarily involve an alteration as to matter, but amendment does. For mere convenience of expression, the action taken by the senate may be, and such action often is called either or both, but, in substance and effect, it was neither. In law, fact and logic, the senate laid aside its own bill and proceeded to consider the house bill. If there was an amendment or substitution, it was not one, made in the form or under the conditions, attendent upon those considered in the opinions cited by Judge

BRANNON. Every one of them was an amendment or substitute, made in the regular course of constitutional procedure. Not one of them was the substitution by one house of a bill passed by the other. In each and all the amended bill had its three readings in both houses, not three in one and only one in the other, as in this case. Such were the character and attendant circumstances of the substitute, to which the text incorrectly quoted from 26 A. & E. Enc. L. 540, applies. Such were the amendments and substitutes in *People* v. *Thompson,* 7 Pac. 142; *State* v. *Dillon,* 42 Fla. 96; and *Cleveland* v. *Anderson,* 66 Neb. 261, and the text in 36 Cyc. 952. Judge BRANNON says in his opinion the amended bill in *Board* v. *Fowler,* 50 La. Ann. 1358, had its three readings in the senate where it was amended by substituting a new draft of it made by a committee. Does he mean to say the other house had not previously, or did not subsequently, give the same bill its three readings? Of course he does not. He speaks only of what occurred in the senate, assuming the procedure in the house to have been regular and unquestioned. Such was the character of the amendment or substitute involved in *Miller and Gibson* v. *State,* 3 O. St. 475. Judge BRANNON correctly says so. As the bill had had its three readings, the court said it was immaterial that its terms and provisions were altered in the course of the readings. Parliamentary readings are provided for the very purpose of perfecting bills by alteration. In that case, the court said the name given the substitute, "New Bill", was an immaterial matter. It was none the less an amendment. This language from the opinion makes the position of the court clear: "When the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times and on different days; but when there is no such vital alteration three readings are not required." This says only that three readings after amendment are not required. It does not say three readings or any readings of the bill may be dispensed with. *Nelson* v *Haywood,* 91 Tenn. 596, involved nothing more than the validity of the adoption of a conference agreement by both houses, settling differences between them, arising upon a bill regularly and successively passed by each, after its three constitutional readings in each. The only other authorities cited by Judge BRANNON, as applicable to this branch of the

case, are note 30, 36 Cyc. 956, and *Gaines* v. *Harrigan,* 4 Lea (Tenn.) 608, dealing with the necessity of concurrence in an amendment. That has nothing to do with a case of the kind of substitution we have here. The doctrine is there applied to a bill that had had its three readings in the house of its origin and then three additional readings in the other.

Whether such of these decisions as dispose of substitute bills are sound may be very well doubted. A substitute is not a a simple or ordinary amendment. What we have here is in reality neither a substitute nor an amendment, I repeat, but, if it were, it would be more than a mere amendment. In congressional procedure it is called an "amendment in the nature of a substitute", and treated as an original bill. "Under the practice of the House for many years, where a substitute is reported by a committee for a bill the substitute alone is considered, the original bill being without objection laid on the table. If there be objection, then the original bill is sent to the proper calendar, and the proposed substitute treated as an 'amendment in the nature of a substitute.' The substitute is read a first and second time, is numbered, and becomes to all intents and purposes an original bill. This has been found much more convenient than the old practice when bills were not printed as now. Formerly it was the practice to treat a substitute as an 'amendment in the nature of a substitute', viz: by striking out all after the enacting clause and inserting the matter proposed or recommended by the committee in lieu of that referred." Con. Man. Dig. Rules & Pr., 2nd Session 50th Cong., pp. 491-2. The details of the old practice are not so fully indictated as those of the new, but as the new is simpler and involves additional readings as in the case of an original bill, the old must have involved that and something more. As general parliamentary law requires a substitute to be treated as an original bill, we may well say the framers of the state constitution contemplated such treatment. In using the word "bill" they meant a bill in the parliamentary sense, and, as a substitute, wholly wiping out original matter, not merely altering it, is in parliamentary law the equivalent of an original bill, it cannot reasonably be assumed they did not intend a substitute to be so treated. Parliamentary law as defined and administered in the national Congress is generally observed and applied in the state legislatures. Our own

legislature adopts the rules of the national House of Representatives. So do other legislatures, possibly all of them. The national Congress is confessedly the highest and best authority on the subject. Following it, I should say, notwithstanding the three or four state decisions, treating a substitute as an ordinary amendment, without even noting the radical difference between them, that a substitute is in all substantial respects an original bill, calling for the procedure on such a bill, and; therefore; a "bill" within the meaning of this constitutional clause.

While this conclusion as to the character of a substitute bill is, in my opinion, sound, it is not essential to the correctness of my view as to constitutional procedure on a bill passed by one house and substituted for another bill in the other house, but it harmonizes with the manifest intent and purpose of the constitutional provision and aids the effort to reach the true interpretation thereof. It expresses its reason, intent and spirit, constituting its substance. A bill passed by one house and substituted in the other is more than an amendment; more than a substitute, whatever the correct procedure as to amended and substituted bills may be. If an amendment or a substitute or both, it is in addition thereto a bill of the other house, falling under the constitutional rule requiring successive passage by the substituting house in accordance with a constitutional formula, to give the constitutional period of deliberation. Whatever we may say of the decisions relied upon in the majority opinion, not one of them shortens that period or violates the constitutional reservation of time. Therefore, conceding them to be sound, for the sake of argument, they constitute no basis for the position this Court has taken. This very core or heart of the question is not noticed by the majority opinion.

This decision permits the legislature to clip off forty per cent. of the constitutional period of legislative deliberation, not for anti-saloon legislation only, but for all sorts of legislation, affecting life, liberty, industry, society, property, taxation, religion and every other subject within the pale of legislative authority. This clause cannot be construed in one way for one class of legislative bills or acts and in a different way for other classes. Its interpretation for one is its interpretation for all. The people, in adopting the constitution, put in this clause as a safeguard against hasty and inconsiderate legislation of all kinds,

and so prescribed an arbitrary rule, deeming it to be necessary. This decision opens the door wide to the accomplishment of legislation by strategy, confusion in division of forces between the two houses, surprise and accident. It displaces a single, plain, orderly, consistent and uniform method with a double, confused, indirect and uncertain one. If this does not amount to deviation, injury and abridgment of constitutional right, I am unable to comprehend an infraction of a constitutional guaranty.

For these reasons, I am firmly of the opinion that the bill never constitutionally passed the senate nor became a law, nor reached a stage authorizing enrollment, or signature by the presiding officers of the two houses or the governor, or publication as an act of the legislature.

But, for the purpose of argument, conceding it to have had three readings in the senate, as well as in the house, reconsideration by the senate of the vote by which it had passed, within the time allowed therefor by Senate Rule 52, rendered it a bill unpassed by the senate, and as ineffectual as if it never had been passed. The contrary of this conclusion is asserted chiefly on the ground or claim that the senate had lost jurisdiction to reconsider by communicating its passage to the house and permitting it to be enrolled and signed by the speaker and the president of the senate. The contention is based upon what I am constrained to say, with due deference, is a misapprehension of the meaning of observations in Jefferson's Manual and certain decisions and some dicta, but no actual decision of any court. Jefferson's Manual was prepared by Thomas Jefferson between the year 1796, when he was elected Vice-President and was soon to enter upon his duties as presiding officer of the United States Senate, and the expiration of his term, March 4, 1801. Those were embryotic days of American parliamentary law. It had not been settled or perfected in any sense. The Manual was a mere text book, founded largely upon English parliamentary law, in which reconsideration was unknown, as the Manual itself says. Section 43. It is not to be supposed that everything he then wrote on the subject of reconsideration has been accepted, and, in fact, it has not. To a limited extent only, his manual was adopted by the House of Representatives September 15, 1837, and not earlier. Its principles and rules

were adopted in all cases in which they were applicable and "not inconsistent with the standing rules and orders of the House and the joint rules of the Senate and House." That work recognizes the right of reconsideration under general American parliamentary law in the absence of a special rule on the subject. Whenever the general doctrine of the Manual conflicts with the special rule, the rule prevails. That is expressly provided by the resolution of adoption. Jefferson's view of the general law, not a rule such as is involved here, was stated as follows: "The rule permitting a reconsideration of a question affixing to it no limitation of time or circumstance, it may be asked whether there is no limitation? If, after a vote, the paper on which it is passed has been parted with, there can be no reconsideration: as if a vote has been for the passage of a bill, and the bill has been sent to the other house." It was no more than mere speculation, conjecture or opinion as to limitations then undefined. He cited no precedent and does not assert that a vote of passage cannot be reconsidered after the bill has been sent to the other house. He merely instances that as an example under his supposition or personal view. When in the course of their legislative experience, it became necessary for the two houses of the Congress to settle and determine this question, both settled it in a manner contrary to Mr. Jefferson's view, by providing for reconsideration of any and all questions carried or lost, and have interpreted and applied these rules so as to include votes by which bills have been passed, after the bills have gone out of the possession of the houses. The House rule says "When a motion has been made and carried or lost, it shall be in order for any member of the majority, on the same or succeeding day, to move for the reconsideration thereof" &c. The Senate rule says "When a question has been decided by the Senate, any Senator voting with the prevailing side may, on the same day or on either of the next two days of actual session thereafter, move a reconsideration" &c. Neither of these rules says in express terms the right of reconsideration thereunder shall extend to a vote by which a bill has passed, when the bill has gone out of the house, but both houses decide that the right extends to that class of votes and under those circumstances. See Con. Man. Dig. Rules & Pr. House Rep. 54th Congress p.—. Both houses of the

national congress, the best expositors of parliamentary law in America, have decided that there is no such implied limitation upon a rule making every question the subject of reconsideration, as this Court here asserts, upon mere supposed dicta of courts, not deciding any such question, and acting in cases not involving it or a legislative decision thereof, and the observation of Mr. Jefferson in his discussion of general law and not the interpretation of any express rule on the subject. The second section of Senate Rule XIII, assuming the general terms of the first section above quoted to be broad enough to include such a reconsideration as was had in this case, says: "When a bill, resolution, report, amendment, order or message, upon which a vote has been taken, shall have gone out of the possession of the Senate, and been communicated to the House of Representatives, the motion to reconsider shall be accompanied by a motion to request the House to return the same: which last motion shall be acted upon immediately, and without debate, and if determined in the negative, shall be a final disposition of the motion to reconsider." This is a mere limitation upon the right to reconsider a vote of passage, after communication of the fact to the house, arising under the first section of the rule, already quoted, saying any question decided may be reconsidered. Its purpose is to dispose of two questions by one vote in order to save time. Nor does it submit the question of recall to the House. On the contrary, it assumes duty and obligation upon the part of the house to return the bill, should the motion to reconsider prevail. The pleasure of the house is not considered. The house rule has no such additional provision. It reconsiders and then recalls the passed bill from the senate. The digest of the 54th Congress expressly says this is the practice under the house rule in just such cases as this. It also says the house may reconsider without having the papers pertaining to the subject matter of the vote to be reconsidered before it. The text of the digest I refer to says, in such case, the bill is recalled after the adoption of the motion to reconsider the vote by which it was passed, and then the form of the resolution of recall is given. This is plain, ordinary English, insusceptible of variation in meaning. These are the precedents of which the majority opinion says: "Precedents or instances there are of the federal Senate and House, where one body has, on

request by another, returned bills or resolutions." They go beyond that, saying that, under rules such as the one here involved, as interpreted by the greatest bodies of parliamentarians in America, a motion to reconsider the vote by which a bill has been finally passed is in' order and may be acted upon and adopted and made effective after the bill has gone physically out of the house or senate, as the case may be, and before its return. They completely cut the foundation from under the majority opinion, and utterly destroy the basis of the decision. No case can be found actually deciding that a motion to reconsider a vote of passage after the bill has left the house is too late. No court says so. Legislative, parliamentary law and practice say it is not too late. I agree that the question is one of law, but we must use applicable law, actual law, not inapplicable decisions, not mere speculation aside from cases in hand. Parliamentary law must be in or entirely out on this question. If Jefferson's Manual is to come in, the legislative practice under it must be considered also. It is only in for what it is worth and as it has been interpreted and applied by reputable parliamentary bodies, and it does not override an express inconsistent rule. The precedents say the action of the senate, in reconsidering its vote of passage, destroyed that vote and the bill thereby became an unpassed bill, even though it was not then in the custody of the senate, and that there is no such implied limitation upon the rule, governing reconsideration, as is here asserted, wherefore the refusal of the house to return the bill was wholly immaterial.

It might, in violation of duty, refuse to do so, but could not thereby tie the hands of the Senate or destroy its constitutional powers. Such refusal could only prevent further action on the bill by the Senate. The Senate rule, authorized by the constitution, reserved power in the senate to undo its vote of passage, no matter where the bill was, even though it were in the hands of the governor. So says the Congress of the United States. The Senate, therefore, had passed the bill, subject to its reserved right to rescind its action, and did rescind it. If the house did not choose to return it and allow its friends in the Senate to attempt to pass it again, so much the worse for the bill and its friends. It could not arbitrarily and of its own strength make it law by its mere claim or declaration of opinion. I

do not say the senate could have compelled the house to return the bill, but the refusal of the latter to do so could not abrogate nor render ineffectual the senate rule, reserving power to nullify the vote of passage. The bill, after that annullment, had not passed. That being its condition, it was no law. I agree that a law once fully and finally passed, and gone beyond the period reserved for reconsideration, cannot be recalled or annulled by one house and probably not by both, otherwise than by a new act of repeal, but that is not this case. This bill had never reached that stage. The only pretext for the contention that it had is the assumption of an implied limitation upon the rule, reserving right of reconsideration, and I have shown there is no such limitation. There being none, the reconsideration killed the bill before it got out of the power of the senate. It therefore, never so far passed the senate as to become a law, for the approval of the governor or any other purpose. In common parlance, there was "a string" to the Senate's vote of passage, attached and retained by that body under authority conferred by the consititution of the state, saying "Each house shall determine the rules of its proceedings." Senate Rule 52 says "any question" may be reconsidered. Could any language be broader. In parliamentary law and practice almost everything is called a question. The term "question" is broader than "motion", "resolution" or almost any other that could have been used. The presiding officer brings on a vote of final passage of a bill by the explanatory announcement, "The question is on the passage of the bill", and then puts the *question* by saying "Shall the bill pass?" Does not this fall technically, lexically, substantially, rationally and conclusively within the terms of a rule reserving to itself power to reconsider the vote on *"any question?"* That power to reconsider under this rule extends to a vote passing a bill is not denied by my associates. They only deny applicability or availability of the rule, because the bill was not physically in the senate at the time. The rule makes no such exception. On the contrary, the terms preclude it, saying a motion to reconsider any question may be made at any time within two business days thereafter. The two day limitation is the only one. Its presence impliedly says there shall be no other. The senate, having formulated and adopted the rule, gave its attention to the subject of limitations upon

the power of reconsideration, and inserted one only. Presumptively, therefore, it intended no other. If it had intended such a one as is here claimed, the rule would have been made to read "a motion to reconsider any question within two business days thereafter shall be in order or may be made, provided the bill on which the vote to be reconsidered was taken has not passed out of the custody of the senate." The reading of a rule, having no such limitation, as if it had, must arise from some sort of necessity. What legal principle justifies it? Does the constitution require it? No, there is no pretense of any constitutional term, clause, provision or purpose requiring such a limitation or forbidding the scope of the rule, as plainly indicated by its terms. Is there a rule of public policy requiring it? None at all. Nobody has suggested, or is able to show, anything of the kind. Has any parliamentary body, except the House of Delegates in the one instance and contrary to its own practice for half a century, ever construed such a rule as being subject to such an implied limitation? Not at all. There is no reference to any such thing or anything else calling for it. Now I respectfully submit that an implication must stand upon some reasonable basis, something other than the mere *ipse dixit* of a court. It is not the province of the courts to make law for a legislature, nullify its rules or otherwise restrain what are so plainly its powers and rights that no reasonable ground for denial thereof can be stated. To justify either a limitation or an enlargement, by implication, the probability of intent to make it must be so strong that the contrary thereof cannot be reasonably supposed.

The interpretation of the constitutional clause, commanding "Each house" to "determine the rules of its proceedings," and the rules adopted, pursuant to that mandate, must be evolved from consideration of the constitutional purpose, and the reasonableness and necessity of the rules, if any, as a means of securing mature and careful consideration of, and action upon, proposed laws, correction of errors and inadvertencies and consequent protection of public and private interests and rights. The constitution by this provision as to rules and others makes each house sovereign in its own sphere. No power on earth can compel it to yield its assent to any proposed law. It may pass or reject any bill at its own pleasure. No provision says its

assent may not be given conditionally or subject to the power of recall. Its absolute unrestrained, unlimited and uncontrolable power to give or withhold its assent necessarily includes the power to give a conditional or qualified assent. The whole includes every part, the greater, the lesser. This is a proposition universally recognized in the sciences, in logic and in law. The rule, reserving right to reconsider any question within two business days after the decision thereof, logically and necessarily qualifies the assent of the senate to any bill, resolution or other measure it passes. It passes subject to this power, not of recall, but rescission or annullment of its vote of passage. That done, the senate stands ready to further consider the measure and recalls it for that purpose. If the house, favoring the measure, refuses to return it, its action affects it and its measure only. It does not thereby hurt the senate or restrain its powers. That body can redraft and pass a new bill on the same subject in the same or different form. This interpretation of the rule reserves to the senate its sovereign power over a matter completely and necessarily within its province. The effect of this decision is to enable either house, notwithstanding express reservation of such power to correct errors of any kind by the other, to prevent the exercise thereof. Prevention of the enforcement of such a rule by refusal to return the bill is tantamount to denial of the right and power of such other house. What can it avail either house to possess a power the other can prevent the exercise of? Such a power is no power. This decision, interpreting the action of the house in refusing to return the bill as a nullification of the effect of the senate's vote of reconsideration, makes the power of the senate to adopt and enforce that rule no power at all in the very teeth of the constitution and despite its plain and emphatic terms.

And it does this unnecessarily. The retention of the bill by the house can be sustained without denial or abridgment of the senate's powers, as I have shown. It defeated further consideration of the bill, without annulling the action of the senate. Is not a vote passing a bill a proceeding of the senate? Is not the rule for reconsideration a rule for, or relating to votes, votes being proceedings? Are not the terms of the rule broad enough to include all of the senate's votes? Does not the constitution say "Each house shall determine the rules of its pro-

ceedings"? Can that be read as authorizing the house to say
what the rules of the senate shall be, or the senate to say what
the rules of the house shall be, or how either shall construe its
rules? Does not this decision plainly allow the house to deter-
mine for itself and its purposes the meaning and effect of the
senate's rule? The house had no part in the making of the
rule. Under the constitution it could not have. That instru-
ment does not confer power upon both houses to make the rules
for each. It confers that power upon each for itself and not
for the other. It says each house shall determine, (make and
construe), the rules of its proceedings. The language is a
command to the senate to make its own rules and to the house
not to interfere in that action, and *vice versa.* Under the same
authority, the house adopted a rule for itself on the same sub-
ject, and each of them, for more than four decades, interpre-
ted, acted upon and applied its own rule, just as the senate did
in the case of this bill, and each recognized such interpretation
by the other as sound and binding upon it. To hold both
houses to this settled construction of the reconsideration rule is
the mere application of indisputably established principles.
Assuming the rule to be joint and ambiguous as to the right to
reconsider, under the circumstances here stated, though it is
neither, the conduct of the two houses for so long a time set-
tles the question in favor of the conclusion of the Senate. If
two parties make a contract uncertain in its terms and provis-
ions, and then, by their conduct, agree upon its meaning, their
conduct, as matter of law, determines its construction. This
case is much clearer and stronger. We have no element of con-
tract or agreement here. The senate, being sole maker of this
rule, has the sole right to expound it. Its interpretation there-
of has been uniform from the beginning.

Is there any reason or necessity for a rule, reserving such
power of review and correction? Denial thereof is the assertion
of the infallibility of men, their inability to err in judgment,
immunity from involuntary action as the result of deception and
fraud, and impossibility of oversight of clerical errors. It is to
assert of legislators a higher regree of sagacity, mentality, alac-
rity, industry and ability of every sort, than the members of
this or any other court of last resort in this country is deemed
to possess. All of them have acknowledged power to reserve

right to rehear cases, after decision, and annul final decisions, when such action is necessary to the proper application of the law and effectuation of the legal rights of parties. Wise and perfect as judges are supposed to be, it is a principal of universal law that any court, trial or appellate, may alter its decision at any time before the adjournment of the term at which it was rendered. It is the practice of this Court to suspend all of its final orders, judgments and decrees, rendered close to an adjournment, for the allowance of the filing of petitions for rehearing, after the adjournment. Nobody has the hardihood to question the necessity, wisdom or justice of these reservations of power to correct errors in final dispositions of cases. These are all single cases, most of them affecting only two individuals. The action of the senate or house, in passing a bill often affects all the citizens of the state and always a large number. It does not merely decide a case; it makes a law for the state. It is an infinitely broader and graver transaction than the mere decision of a controversy between two citizens. In so far as precedents make law, it is of the same character, but erroneous precedents may be set aside by the courts. Erroneous statutes cannot be. In this analogy, emphasized by the difference in character between the two functions or processes, absolute and undeniable necessity for reservation of corrective power is found. I do not read the majority opinion as plainly asserting the contrary. It merely ignores the subject and, in effect, denies the proposition.

The theory of the opinion, though not stated, seems to be that a branch of the legislature cannot or should not, for some reason, reserve this power of correction by a general rule, holding all final votes for a very limited time, two days in this instance, but must decide, once for all, instanter and at its peril, on the passage of a bill, whether it desires, or probably will desire, to reconsider the vote, and pass a special resolution or adopt a special motion, forbidding the ministerial officers from taking the bill out of the house. This is simply an assumption of power on the part of the judiciary to make rules for the legislature, or tell that body how it must make them, which amounts to the same thing, in the face of a constitutional provision saying "Each house shall determine the rules of its proceedings." In conferring that jurisdiction upon the legislative houses, the con-

stitution denied it to the courts. Which of two plans for accomplishing a legislative purpose is the better is not a question for any court. Having unlimited discretionary power over the subject, the senate or house may make its own choice and the court should be more willing to respect its action in so doing than that of petty ministerial or judicial officers, the binding force of which is here acknowledged daily. Moreover, I do not see how a court could complain of the adoption, by a legislative body, of the corrective plan or method, employed for the purpose by the court itself, if it had supervisory power over such body. All court decisions are subject to correction until the end of the term. The courts do not take upon themselves the inconvenience and labor of specifying, as they go along, what particular decisions are so far beyond suspicion of error, as to be safely allowed to become final and irreviewable, and what are not and so ought to be held open, and thus expose themselves to liability to do irremediable injury to litigants. This Court has never done so. Its practice is exactly the contrary. Its general rule is to hold all; the rare exception to let one go beyond recall without allowing time for a petition to rehear. Legislative experience has settled the relative merits of these two plans, but, if it had not, the court has no jurisdiction of the subject matter.

Carrying the inquiry as to reason and necessity further, I note the radical difference between legislative action and other kinds. Entry into a contract is wholly voluntary and free from compulsion in any form. So is the action of every court. The governor, in approving or disapproving a bill, has the matter wholly in his own hands. In none of these instances are there rules by which the actor can be hurried or forced into a hasty decision. Nobody can act for him in any manner, form or degree. He takes his own time and registers his own deliberate conclusion. He is not surrounded on every hand by other pending measures, backed by energy, industry and skill, eager to push them forward at ever opportunity. The situation of the legislator is different. His time is not his own. It is everybody's. He must watch a hundred things at one time. He is surrounded with dangers on every hand and burdened with things innumerable to be done within very little time. He is in constant war, and as often on the defensive as the offensive. Under the quorum and majority rules, his measures may be defeated or

those of his opponents advanced or passed in his mere momentary absence. A bare majority of a bare majority, a small minority of the whole body, may, in the temporary absence of members, necessary and unavoidably, rush a ruinous measure through the house, send it out to the other and make the action irrevocable against the will of a large majority of the whole body, under the doctrine declared by this decision. Thus it opens the door to a species of legislative trickery and fraud, abhorrent and degrading on its very face, and possible of achievement despite the utmost diligence and faithfulness on the part of members. In view of such differences in character, circumstances and possibilities, the reasons for holding the deliberate contracts of parties and actions of governors and courts binding and irrevocable, after stated periods, fixed by common or organic law, do not apply to legislative bodies. It cannot truthfully be said the conditions and circumstances are the same. Hence the reasoning cannot be the same, nor can the cases be assimilated. No case decides the question we. have here in accordance with the majority opinion. It never has been done. It has been held that a governor, after passing on a bill and placing it out of his possession, cannot withdraw or annul his action, but that is not this case. For that holding, there are the reasons I have given, inherent in the difference in situation and circumstances, and an addiditional, conclusive one, the emphatic language of the constitution saying the bill shall be a law as soon as he has signed it. It does not say a bill shall be deemed to have passed a house as soon as a vote of passage shall have been taken therein. The constitution leaves it to the house to say when and how its action shall become final, by authorizing it to determine the rules of its proceedings. As to the governor, there is no such provision. The rule declared by my associates would irrevocably bind the house first passing a bill and sending it to the other, notwithstanding its continued pendency in the legislature, as mere proposed legislation, not law. This doctrine converts the legislature into a hoisting jack or capstan, with its ratchet, cog-wheel and pawl, falling successively into the cogs, and making every act irrevocable, whether the result of error, trickery, fraud or what not. Why? No reason has been, or can be, given for it, and no authority, while all reason and all authority are against it. For finality and irrevocability of

the click of the pawl in the jack or capstan, there is imperative reason. For the use of the equivalent of such an instrument in legislation, there is no reason. It can effect nothing but unintentional wrong, injury and public humiliation and shame, as it would in the administration of the law by the courts. What sustains or applies it here, in the opinion of a majority of this Court? No decision, no precedent, nothing but a mere fiction, suggested by a few judges, without investigation, and arising from misapprehension of the true import of their words. As the law of mechanics permits the introduction or use of no instrument or appliance, not reasonably necessary or useful, so the civil law allows no fiction and adopts no arbitrary rule, except for the effectuation of just, reasonable and useful purposes. Against the adoption of this injurious fiction, I set up here the legal principle, just stated, and cite the authority for it. *Hussman* v. *Durham,* 165 U. S. 144; *Gibson* v. *Chouteau,* 13 Wall. 92; *State* v. *Lumber Co.,* 64 W. Va. 673, 697.

Failure of analogy, so much relied upon, to sustain the position of the majority here is almost as obvious as that of reason and authority. Final judgment and adjournment of the court ends the jurisdiction. Presentation of a passed bill to the governor may be the beginning of another, like the granting of an appeal. But the situation of this bill at the time of the reconsideration was by no means like that of the judgment or the presented bill. Transmission out of the house is not a final act, and does not convert a mere legislative proposition into law. The jurisdiction of the legislature has not ceased. The session still continues, like a term of court, until adjournment. Legislative jurisdiction continues until that of the governor begins. Could he force either house, or either house force the other, to present a bill to him, though it had passed both? By what process? Legislative jurisdiction not having ended, which house had it? Necessarily both, for the legislature is composed of both. After passage the bill was the bill of both. The passed bill in the hands of that committee, an agency of the senate as much as that of the house, was in the control of the senate as much as of the house. Alleged transmission back to the house was no transmission. It amounted only to notification of senate action. Before that bill got out of the hands of the joint committee into those of the governor, a motion to

reconsider was made and adopted. This effectually tied the hands of that committee. There was then a proceeding, relating to the bill, begun and completed in the senate, before legislative jurisdiction ended, or gubernatorial jurisdiction commenced, as in *State* v. *Savings Bank,* 79 Conn. 141. That committee had only ministerial powers. It was not a department of government, independent, co-ordinate or subordinate. It was composed of members of the two houses, necessarily cognizant of every action of each, pertaining to any matter entrusted to them, and subject to the power of both. It could act only by authority of both, it being a joint committee. In case of disagreement between its two principals, as in this case, it necessarily stood powerless to act. Otherwise one house would be authorized, by the mere creation of a joint committee, to overrule and control the other, a result utterly repugnant to, and inconsistent with, the basic and fundamental theory of the relation of the two houses. Thus utterly failing as a prop or stay to the position of my associates, the doctrine of analogy, on the other hand, emphatically condemns it. This Court and others, after rendition of final judgment, in hundreds and thousands of cases, suspend the orders and so hold the judgments open for inspection and correction of error after adjournment of the term. This judicial practice has its counterpart and equivalent in the legislative reconsideration rule, but not general parliamentary law possibly. So say the dicta of the courts in *Wolfe* v. *McCaull,* 76 Va. 876, and *Devlin* v. *People,* 88 Am. Dec. 377, and this notwithstanding the bill has not only passed both houses, but gone into the hands of the governor.

Having thus fully discussed this subdivision of this branch of the case, from the practical, philosophical and legal points of view, and stated what impresses me as a necessary and inevitable conclusion, arising therefrom, I now undertake to make good the charge of virtual nullity and inapplicability of the authorities, relied upon in the majority opinion. This language of the opinion, professing to be a quotation from Jefferson's Manual: "After a bill, resolution, message, report, amendment, or motion upon which a vote was taken shall have gone out of the possession of the Senate," is no part of that treatise. It is in a book containing the Manual, but it is no part of the Manual. That volume contains the Constitution of the United States,

the Manual, a digest of decisions and the rules and practice of the House and some of the Senate rules and other things. The quoted language is taken from the second section of Senate Rule XIII. Nor is it followed in that rule by the remainder of Judge BRANNON'S quoting sentence, or by anything of like or similar import, namely, "no motion to reconsider can be made." On the contrary, the remainder of that section of that rule necessarily implies that such a motion can be made. I here requote it: "and been communicated to the House of Representatives, the motion to reconsider shall be accompanied by a motion to request the House to return the same; which last motion shall be acted upon immediately, and without debate, and if determined in the negative, shall be a final disposition of the motion to reconsider." Plainly this is a limitation upon the power to reconsider, under such circumstances, reserved by the first section, not a denial thereof. That section gives power to reconsider any "question decided by the Senate," but the second says, if the vote proposed to be reconsidered is one by which a bill has been passed, and the bill has gone to the house, the motion to reconsider shall be indirectly acted upon immediately. Disposition thereof does not await the convenience of senators or the senate. The motion can be made at any time within the two days. The time is not cut down, nor need the motion be acted upon immediately further than to ascertain whether the Senate is willing to recall the bill. Nor does it say action on the motion must await the actual return of the bill. The plain object of this limitation is to prevent the bill from remaining out of the senate, during the pendency of a motion made to reconsider its passage, which may be a period of weeks or months, that and nothing more. The rule of the house has no such provision, nor has Rule 52 of the senate of this state. They reserve the power generally, as does section 1 of the United States Senate Rule XIII. The limitation in that rule is no part of general parliamentary law, and no part of the rule involved here, and, if it were, its terms permit immediate action on the motion to reconsider, after the adoption of the motion to request the return of the bill, and before it has been actually returned. The text relied upon in 26 A. & E. Enc. L., p. 548, deals with an attempt on the part of the legislature to recall a bill from the governor, when the vote by which it passed has not been recon-

sidered by either house, its passage by both houses having been regular and complete in all respects and the power to reconsider being absolutely gone by expiration of time. The cases cited in support of it are *People* v. *Devlin,* 88 Am. Dec. 377, *Wolfe* v. *McCaull,* 76 Va. 876, *People* v. *Hatch,* 19 Ill. 288, and two Texas cases which I do not have at hand now. In *People* v. *Devlin,* the opinion of the court says "all the constitutional requisites to pass the bill had been performed by the two houses of the legislature; to make it a law required but the signature of the governor, which it subsequently received. * * * All that further appears by the journals of the two houses in relation to this bill raise this question: After the passage of a bill in the legal and constitutional form by both houses of the legislature, and the same has been transmitted by them to the governor in the manner provided by the constitution, have the two houses exhausted their power over it? or can they, or can either of the said houses without the consent of the other, recall the bill by resolution, and revest themselves with power to further act upon it? * * * By rule 51 of the assembly Red Book of 1863, page 493, it is provided that 'no motion for reconsideration of any vote shall be in order unless on the same day or the following legislative day to that on which the decision proposed to be reconsidered took place'. No evidence is produced of a compliance with this positive law of the assembly after the final passage of the bill before mentioned, and after receiving it back from the governor." How could the court have decided the effect of the adoption of a motion to reconsider in a case in which it says there was no such motion? The language of the opinion and syllabus in that case must be read in the light of the facts and limited to the case in hand. It declined to say what its opinion or decision would have been if either house had reconsidered the vote by which it had passed the bill, and the journal, showing it, could be regarded as evidence. Is that this case? Do we have any doubt that the journals of our legislature are evidence? There were three distinguishing facts in that case: (1) Neither house had reconsidered its vote of passage; (2) the time for reconsideration had expired; and (3) the bill had been approved by the governor. *Wolfe* v. *McCaull* was substantially the same kind of a case. The material facts are concisely stated in the syllabus, as follows: "The

legislature passed a bill, and presented it to the governor under Constitution, Article IV. section 8; but before he acted, it was recalled by a joint resolution. He returned it without approval or disapproval." No motion to reconsider was adopted. On the contrary, motions to reconsider the votes of passage had been made and voted down in each house. See the statement of this fact in the opinion, 76 Va. page 884, near the bottom, and page 889, near the bottom. In *People* v. *Hatch,* both houses of the legislature had regularly, completely and formally passed a bill and presented it to the governor. He approved it by mistake and his approval thereof was announced to the house. Within thirty minutes thereafter, he sent a message to the house, stating the accident. On the same day he returned the bill with his veto message. These are all the facts. There was no recall or attempted recall from the governor, nor any motion to reconsider either made, adopted or lost. The only question was whether the governor could cancel or withdraw his accidental and unintended approval of the bill. No power, privilege, right, rule or action of either house was at all involved or drawn in question. Judge BRANNON's quotation from that opinion is not predicated on the case the court was deciding at all. It is applied to an hypothetical or supposed case. Just before the part quoted by him, the court said: "Take, for instance, a bill which has been returned to the House of Representatives by the Governor, with his objections, and has passed that house, notwithstanding the Governor's objections, and sent to the Senate, where, in like manner, it has passed, with all the forms of legislation. It has now received all the sanction which the constitution requires to make it a law, and yet no one acquainted with the constant practice of legislative bodies, will deny that it is perfectly competent for the Senate to reconsider the final vote, and thus take from it that concluding act which had finally completed it; and" (Here follows Judge BRANNON's quotation). Every word of it is undeniably *obiter dictum,* if even that. The court had no such question before it for decision and did not profess to have. Moreover, what was there said on this subject was not germane to anything then before the court for decision or discussion. It was said by way of illustration only. In *State* v. *Savings Bank,* 79 Conn. 141, another case relied upon for the court's proposition, the bill was in the

house when the motion to reconsider was made. That decision is not one in a case in which the bill was not in the house, reconsidering its vote of passage. No such question was decided there or even discussed. Nowhere does the opinion say physical possession of the bill was necessary. *Allegheny Co.* v. *Warfield,* 100 Md. 516, *People* v. *McClung,* 210 Ill. 488, and *State* v. *Wisner,* 35 Kan. 271, are all cases involving retraction of approval by the governor and nothing else, and have no application whatever. The other batch of cases which Judge BRANNON says are cited in a brief to sustain his proposition involves no such question as we have here and decide nothing pertaining to it.

The court, in *People* v. *Hatch,* was speaking of general parliamentary law and practice, not altered or affected by a rule, such as the senate here acted under. The quotation itself shows this by the use of the phrase "unless they have some special rule restraining the right to reconsider." Can the authority of either of our houses to have a special rule, enlarging the ordinary parliamentary law, under the constitutional provision so often referred to in this opinion, be denied? Would not an enlarging special rule alter the general law as surely as a restraining one? Where are the terms forbidding enlargement? I challenge reference to them. This distinction is recognized in *Wolfe* v. *McCaull.* There the rules are stated as well as the general law and the distinction noted. Had Judge BRANNON gone one sentence further with his quotation from the opinion in that case, he would have had part of it in his opinion by adoption. Immediately after his quotation this is found. "But in Virginia the rules of both houses of the general assembly fix the time and mode by which a bill passed may be reconsidered." Note the disjunctive "but," marking the distinction. The opinion then proceeds as follows: "By the constitution each house is allowed to adopt its own rules. House rule 70 provides that 'when a question has been decided, it may be reconsidered on the motion of any member who voted with the prevailing side, provided the motion be made on the same day or the next two days of actual session.' Rule 61 of the senate is to the same effect. (See also Jefferson's Manual page 92, which is adopted by both houses as their guide). According to these rules, and the general practice, a motion to reconsiderd the same vote cannot be

made twice, and if made at all, must be made upon the day of the vote or upon one of the two ensuing days. In the case before us, a motion to reconsider was made in each house within the proper time and lost. (See House Journal, 303, and Senate Journal, 261-267). After this was done, and after it was sent to the governor, the legislature had no further control over the bill." Certainly not, because there had been no adoption of a motion to reconsider, a second motion therefor could not be made and the two days had expired. The opinion in the case, however, carries on its face the proposition that, under the rules, but not general parliamentary law, the reserved power of reconsideration was valid and effective for two days, even though the bill had gone into the hands of the governor. So does *People* v. *Devlin,* herein analyzed.

Rules adopted under that provision are laws of which everybody having relations with either the senate or the house, including the executive and the other house, must take notice. They must also respect them, just as they do the powers and rights of other tribunals and officers. While these parliamentary laws are limited as to their sphere, they are sovereign and irreviewable within it. Otherwise a legislative body could not perform its constitutional functions. This would be impossible if one house could ignore the rules or laws of the other and the governor those of both. For the same reason, each house is the sole interpreter of its own rules. They must be respected as it construes, applies and enforces them, no matter whether its construction is correct or not. On this subject we have direct authority in *State* v. *Savings Bank,* 79 Conn. 141, in which the court both states and applies this proposition in the following clear cut, convincing language: "Courts are not warranted in setting aside, as void, action of a legislative body in respect to a matter clearly within its power, merely because that body may have violated or departed from its own rules of procedure. Such rules are the servants of the legislative body and are subject to its own independent authority." Syl. "There being no claim of a violation of any constitutional restriction, we cannot pass upon the regularity of these proceedings. The power of the House, directly after the passage of a bill, and on the day of its passage, to suspend the operation of that vote, to reconsider the vote, and to take different action, cannot be questioned.

The constitution declares that each House shall determine the rules of its own proceedings and shall have all powers necessary for a branch of a free and independent state. Rules of proceedings are the servants of the House and subject to its authority. This authority may be abused, but when the House has acted in a matter clearly within its power, it would be an unwarranted invasion of the independence of the legislative department for the court to set aside such action as void, because it may think that the House misconstrued or departed from its own rules of procedure." Opinion. The action of the Connecticut House of Representatives which the court refused to set aside in that case upon these considerations and legal principles, was the killing of a bill it had passed by reconsideration of its vote of passage, just the kind of action this Court is setting aside. Here the senate, not only construing its own rule, but construing it as it always had been construed, with the knowledge and acquiescence of the house, and as the house had always construed its own similar rule, with the knowledge and acquiescence of the senate, both having been always in perfect accord and agreement upon that question, rescinded the vote by which it had passed the bill. It acted within its admitted province, and under a rule, susceptible of the construction it gave it, whether that construction was technically right or wrong, and the Connecticut court, the only one that has spoken directly upon the subject, absolutely the only case directly in point that has been found, says such action cannot be disturbed by a court, no matter whether the construction was right or wrong. Legislative action is not judicial, nor subject to review like that of inferior courts. Of course mere arbitrary legislative action in a matter beyond its authority, would be void, and its action in an arbitrary and groundless manner, within its province might be, but such was not the character of the action of the senate involved here.

Another suggestion of possible ground for the position taken by my associates is that, assuming the motion to have been made and acted upon within the time and under the circumstances, allowing it, the passage of the bill was not annulled or rescinded by the adoption thereof. No authority is offered for this. On the question of the effect of the adoption of a motion to reconsider a vote passing a bill, we have direct authority in

*State* v. *Savings Bank,* 79 Conn. 141, in which the court held
that the house rendered a bill it had passed an unpassed one by
reconsidering the vote by which it had passed, and then indefi-
nitely postponing consideration of the bill. It was not put on
its passage and rejected after such reconsideration. Indefinite
postponement had nothing to do with the question of passage,
either prior or subsequent. The bill was killed after passage.
Now what could have done that other than the adoption of the
motion to reconsider? The *obiter dictum* in *People* v. *Hatch,*
19 Ill. 283, from which Judge BRANNON has quoted, says re-
consideration alone rescinds or nullifies the vote reconsidered.
We read: "and yet no one acquainted with the constant prac-
tice of legislative bodies, will deny that it is perfectly competent
for the senate to reconsider the final vote and thus take away
from it that concluding act which had finally completed it."
Every text book on parliamentary law that deals with this ques-
tion says the same thing.

Finally, we have the conclusion of the majority opinion in
these words: "Without asserting that the failure to vote a re-
jection of the bill left the original vote of passage still good, we
do say that a court after such procedure cannot hold the act
null and void." The "procedure" consists of the facts stated at
the beginning of the opinion. For this conclusion no authority
at all is given, and no legal principle is invoked, unless it be
the one embraced in the sentence immediately following it which
says "And further, if this is doubtful, then the rule that before
a court can hold an act invalid the question must be clear, is
alone enough to deny the *mandamus.*" The next sentence ad-
mits that "If there had been no vote of the senate passing the
bill the case would be different." Now, according to the only
decision, directly in point on this question, the *dicta* of others
and legislative practice in this state and the national congress,
this bill is in the same state and condition as if it never had
passed the senate. In *State* v. *Savings Bank,* 79 Conn. 141,
the court actually decided, as the vital and basic question in the
case, that "A bill retained by one house of the General Assem-
bly to await its decision upon a motion to reconsider its action
in passing it, is not then in a situation to be 'presented' to the
Governor for his approval, nor can it be said to have 'passed
both houses' within the meaning of that expression in Article

4, section 12 of the Constitution of this State." In its opinion the court said it was immaterial that the bill had been transmitted to the governor, apparently in regular order, but in fact by inadvertence. There was no express order of retention to await action on the motion to reconsider. The agreement upon the facts in the case says: "As shown by the journal of the House on June 15th, the rule requiring the clerk of the House to hold bills and resolutions one day for reconsideration was suspended for the remainder of the session." See page 145. Notwithstanding this, the court upheld the ruling of the house that a mere motion to reconsider, although tabled, amounted to a retention of the bill, notwithstanding the officers, including the governor, interpreting the effect of the action of the house otherwise, had put the bill through all the usual subsequent procedure as if it had finally and irrevocably passed. The motion to reconsider having been tabled, they regarded that as final, and acted accordingly. The house decided the question otherwise, under its claim of authority to do so, and the court sustained its action, saying it mattered not, whether in acting as it did, that body correctly interpreted its rules, orders or proceedings or not. That is what the senate has done here, upon a slightly and immaterially different state of facts. *State* v. *Savings Bank* emphatically decides that reconsideration of a vote of passage renders the bill an unpassed one. Whether the Senate reconsideration here was too late is a different question, which I have discussed fully, showing conclusively that the motion was not too late. The status of the bill was, therefore, the same as if it never had passed the senate. For this reason, the acts of presiding officers and clerks or even of the governor, if he had acted, before reconsideration, were futile and unavailing. They could not cure the fatal defect or omission of lack of passage by the senate. Passage by both houses is confessedly indispensable. No bill can become a law without it. Nothing can be substituted for it. It is no answer to this to say the journal shows passage of the bill on a certain date. It just as clearly and emphatically shows rescission or nullification of that action. There is no ground of doubt here. Reason and authority completely exclude it. Nothing would be easier of accomplishment than the creation of doubt in any case, if a mere adverse assertion or claim constituted a basis therefor.

On a further examination of the authorities, in passing upon the petition for re-hearing, I find in Hinds' Precedents of the House of Representatives, Vol. V, sections 5666, 5667 and 5668, ample justification of my position, respecting the jurisdiction and power of the senate, under its rule, to reconsider the vote by which it passed the bill in question, after that paper had left the senate. In 1840, R. M. T. Hunter, Speaker, entertained a motion to reconsider, under such circumstances, overruling a point of order made against it, and, on an appeal, was sustained by the house. He based his decision upon the terms of the house rule, providing that "When a motion has been once made and carried in the affirmative or negative, it shall be in order for any member of the majority to move for a reconsideration thereof on the same or the succeeding day." In 1844, a like ruling under like circumstances was made by Speaker John W. Jones, and sustained by the house on an appeal. In 1846, Speaker John W. Davis (of Indiana) entertained a motion to reconsider the vote by which the house had agreed to resolutions, calling upon the president for certain accounts, made after the resolution had been delivered to the president, overruling a point of order, and, on an appeal to the house, his ruling was sustained. The principle was applied under conditions still less favorable to it in a ruling made in 1854 by Speaker *pro tem,* Geo. W. Jones. The house having agreed to a senate amendment to a house bill, a motion was made to reconsider the vote by which the house had so agreed. A point of order was based upon the fact that the house had notified the senate of the agreement in consequence of which the bill had passed beyond the control of the house. The speaker overruled it and, on appeal, his ruling was sustained by the house. In 1840, a motion to reconsider the vote of passage by the house of a senate bill which had been sent back to the senate and gone into the hands of the committee on enrolled bills, was both entertained and voted upon. Hinds, Vol. V., section 5705. That bill was in the hands of the committee on enrolled bills when the motion was made and voted on just as this bill was when the senate entertained and acted upon its motion to reconsider. Here we have four specific instances of deliberate decision by the House of Representatives itself, not merely the Speaker, construing and applying a rule, in all substantial respects like that of the Sen-

ate of this state, as authorizing a motion to reconsider, under
the circumstances attending the action of the state senate now
under consideration, and asserting reservation of jurisdiction
and power of a legislative body, operating under such a rule, to
rescind a vote of passage after the bill has left the body.   Is
it supposable the house would entertain such a motion without
power to make it effective?   Would it entertain the motion to
be acted upon only in case the senate should return the bill?
In these instances, the senate was not consulted, though the ab-
sence of the bill and its possession by the senate were urged in
support of the point of order.   In a note applicable here, Hinds
says: "Where a bill thus reconsidered has been sent to the senate
or to the President it is customary to send a request for its re-
turn."   He does not say it is necessary, and the terms he used
imports affirmative action upon the motion before the request is
made, and this accords with the application of logic and prin-
ciple.   No court will entertain a case it cannot decide.   So it
would be idle and ridiculous for a legislative body to entertain
a motion it could not make effective.   Moreover every precedent
found denies authority in a co-ordinate branch of a legislature
to refuse a request for the return of a bill, if precedents and
practice mean anything, for no instance of the refusal of such
a request can be found.   There is no parliamentary precedent
for the position that a legislative body cannot vote upon a mo-
tion to reconsider without having actual custody of the bill or
other paper.   If it be conceded that ordinarily such bodies do
not do so, the fact does not argue inability to do so.   What
either house of congress would do in a case of refusal by the
other to honor its request for the return of a bill has never
been decided, so far as we know.   Its power to entertain the
motion without custody of the bill settles the question of juris-
diction, from which power to make it effective by a vote on it
necessarily follows.

Cushing's Law & Practice of Legislative bodies, at section
1274, says the motion may be made, discussed and decided in
the affirmative, without the custody of the bill.   We quote:
"The first step, therefore, after a vote to reconsider is to send
to the other branch or to the executive, for the paper in refer-
ence to which the vote to reconsider passes, or otherwise to
bring it before the house.   Possession of the paper may also

be obtained before the motion to reconsider is made." Here he distinctly says or assumes that the motion may be made and voted upon in the absence of the paper or bill.

Gilfry's Precedents, Decisions on Points of Order in the United States Senate, page 411, mentions a case of refusal of the Senate to entertain a motion to reconsider a vote, recorded April 12, 1830, consenting to the appointment of an officer by the president, because the resolution confirming the appointment had been communicated to the president. At that time, the senate had no such rule as the house had when the rulings above referred to were made, nor any such rule as our state senate has.  Its practice was in accordance with the ruling in the case mentioned by Gilfry; but it later adopted a rule abolishing the absurd and inconvenient practice. Says Hinds, Vol. V, section 5671: "On January 16, 1877, the Senate, while revising its rules, agreed to a rule providing that when a motion to reconsider a bill that had been sent to the House should be made, it should be accompanied by a motion requesting the House to return the bill to the Senate. This was intended to obviate the difficulty experienced by the fact that the Senate usage did not permit a motion to reconsider after the bill had passed from out the possession of the body."

Gilfry, at page 493, puts a stronger case than any I have mentioned, showing how a motion to reconsider may be made in the United States Senate after expiration of the time allowed for reconsideration, prescribed by its rule. To accomplish it, a senator, after having moved a re-call of a bill passed by the senate and sent to the house, in conformity with the senate rule, asks unanimous consent to move to reconsider the vote by which it passes, and no objection being made the motion is entertained. Here is jurisdiction after expiration of the time allowed by the rule.

Having shown jurisdiction of the House of Representatives, operating under a rule like that of the state senate, to entertain a motion to re-consider a vote of passage after the bill has gone to the senate, I turn to the question of its effect, when made. Hinds says, section 5704: "When a vote whereby an amendment has been agreed to is reconsidered the amendment becomes simply a pending amendment. A bill is not considered, in the practice of the House, passed or an amendment

agreed to if a motion to reconsider is pending, the effect of the motion to reconsider being to suspend the original proposition. As to the result when the Congress expires leaving unacted on a motion to reconsider the vote whereby a resolution of the House is passed. If a bill, before the disposal of a motion to reconsider the vote on its passage, should be enrolled, signed, and approved by the President, its validity as a law probably could not be questioned." In this section, Speaker Thomas B. Reed is quoted as follows: "Under our parliamentary system neither a bill nor an amendment is passed or adopted until the motion to reconsider is disposed of. The speaker is not allowed to sign a bill during the pendency of a motion to reconsider. Consequently it still remains an inchoate affair. So that if the motion to reconsider had not been disposed of at all the amendment would probably still not be adopted. But it is not necessary to decide that to dispose of this matter, because there was a motion to reconsider and a motion that that motion to reconsider be laid on the table, which latter motion was defeated. Thereupon the Speaker put to the House the question of reconsideration, and it was carried, and the amendment became simply a pending amendment." Cushing, at section 1265, says: "And if this motion prevails, the effect of the vote in question is abrogated, and the matter stands before the assembly in precisely the same state and condition, and upon the same question, as if the vote, which has been ordered to be reconsidered, had never been passed." At section 1278, he says: "When a motion to reconsider prevails, it has a twofold effect; first, it entirely abrogates the vote passed on the question, which is thereby ordered to be reconsidered; and, secondly, it again brings forward that question, to be discussed and decided in the same manner it was originally, for the consideration and determination of the assembly." It is true Mr. Cushing, at section 1274, says: "If decided in the affirmative, it will be wholly ineffectual and inoperative until the paper in question is in possession of the house"; but he cites no precedent or authority for that observation, nor does he clearly indicate what he means. Of course, further action on the bill cannot be had until it is again in possession of the house, but that does not argue lack of authority in the house to annul its vote of passage, and there is no precedent which says actual reconsideration in the absence

of the bill does not do so. Mr. Cushing admits that the vote may be taken in the absence of the bill. This admits jurisdiction. Why should the house do an idle and futile thing? He says the vote has a double effect, one of which is abrogation of the vote reconsidered. By what process of logic can it be established that, because of some circumstance, the other consequence cannot follow, this one must fail? I repeat there is no decision or precedent for the observation of Mr. Cushing, if his language means what my associates say it does; but that is not his meaning. What he means is that, after the adoption of a motion to reconsider, what follows is action on the bill or resolution, wherefore it must then come back into the assembly, if it has not previously done so.

In the view that a motion to reconsider suspends the vote to which it relates, and the adoption thereof rescinds or abrogates that vote, Roberts, Hinds, Cushing and all authorities agree. Besides, it is the effect universally given to it in legislative bodies. As against these and authorities cited in the portion of this opinion prepared in advance of consideration of the petition for re-hearing, I am not disposed to adopt the views of an inferior New York court, *Ashton* v. *Rochester,* 60 Hun. 372, citing no authority for its contrary holding, and, in this, I am further confirmed by the opinion of the New York Court of Appeals, *Ashton* v. *Rochester,* 133 N. Y. 192, in a case involving the same reconsideration that was passed upon in 60 Hun. The Court of Appeals said: "The vote on the resolution was reconsidered, and consequently the effect which it would otherwise have was lost."

Finally, it is not for this or any other court to say what the true parliamentary rule is, or whether the senate properly construed its rule. Those were questions for the senate itself, as I have already shown. They are not constitutional questions, and the courts have no right to interfere with legislative decisions of purely legislative questions.

Entertaining the views expressed here, I thought a rehearing should be granted and voted for it. I also voted for a modification of the judgments so as to allow costs in only one of the nine cases, for the reason that only one of them was really litigated, the others having been submitted, without argument or full pleadings, under an agreement that the decision upon the

merits in the one argued should govern and control in the others. The one return filed was agreed and ordered to be considered and treated as filed in all the cases or as the return in all. If a consolidation could not have been ordered by the court without the consent of the parties, it could have been done and was done upon their consent and agreement. It was a consolidation by consent of parties, with the same result as if it had been an involuntary one by order of the court. *Rosenthal* v. *Ives,* 2 Ida. 243; *Rodgers & Smith* v. *Dibrell,* 6 Lea (Tenn.) 69; *Howard* v. *Gregory,* 79 Ga. 617; *Burt* v. *Wigglesworth,* 117 Mass. 302.